In re WISCONSIN CENT. RY. CO.

No. 17104.

United States District Court
D. Minnesota, Fourth Division.
April 8, 1953.

See, also, D.C., 94 F.Supp. 165.

James E. Dorsey and Donald West, Minneapolis, Minn., for Edgar F. Zelle, trustee of debtor.

Abraham K. Weber, New York City, for debtor.

William J. Quinn and E. E. Boyner, Minneapolis, Minn., for Minneapolis, St. P. & S. S. M. R. Co.

Thomas P. Helmey, Minneapolis, Minn., for Empire Trust Co. et al., as trustees under debtor's First and Refunding Mortgage.

Bergmann Richards, Minneapolis, Minn., and Paul D. Miller and A. Albert Minton, New York City, for Superior and Duluth Division Mortgage Bondholders Committee.

Henry S. Mitchell and Leonard Murray, Minneapolis, Minn., for Canadian Pac. R. Co.

Reese D. Alsop, New York City, for the Gaston Group.

Jaffin, Schneider, Kimmel & Galpeer, by Irving J. Galpeer, New York City, and Josiah E. Brill, Minneapolis, Minn., for First and Refunding Mortgage Bondholders Committee.

Samuel H. Morgan, St. Paul, Minn., for United States Trust Co. of New York, as trustee of the debtor's First General Mortgage.

Cadwalader, Wickersham & Taft and Cornelius W. Wickersham, by C. W. Wickersham, Jr., New York City, for First General Mortgage Bondholders Committee.

NORDBYE, Chief Judge.

On December 2, 1932, the debtor was placed in equity receivership, which proceedings continued until a petition for reorganization of the debtor was filed and approved on September 30, 1944. E. A. Whitman and Edgar F. Zelle were appointed Trustees on November 17, 1944, and qualified as such Trustees on January 1, 1945. On August 4, 1947, Mr. Whitman died, and Mr. Zelle has continued as sole Trustee since that date. The debtor has railway lines in Minnesota, Wisconsin, Illinois and Michigan which total an approximate 906 miles and which are operated by the Minneapolis, St. Paul & Sault Ste. Marie Railroad Company, hereinafter called the Soo Line, as agent for the Trustee. The debtor has three mortgages: the First General mortgage, which is a first lien on its main line and on practically all of its equipment; the Superior and Duluth mortgage, which is a first lien on the Superior and Duluth Division of the debtor railroad; and the Refunding mortgage, which is a second lien on all of the debtor's property, except for the Marshfield Division and a small amount of equipment on which it is a first lien.

As of July 1, 1952, the effective date of the plan, the outstanding obligations of the debtor, exclusive of some interest which will be paid in cash on consummation of the reorganization to the extent not theretofore paid, were as follows:

| | Principal | Interest | Total |
|---|---|---|---|
| Equipment Obligations | $ 2,362,241 | | $ 2,362,241 |
| First General 4's | 12,455,000 | | 12,455,000 |
| Superior and Duluth 4's | 7,500,000 | $5,900,000 [1] | 13,400,000 [1] |
| Refunding 4's | 5,816,000 | 3,431,440 | 9,247,440 |
| Refunding 5's | | | |
| Principal and secured | | | |
| 4% interest | 10,000,000 | 7,900,000 | 17,900,000 |
| Unsecured 1% interest | | 1,975,000 | 1,975,000 |
| Soo Line [2] | | | |
| Refunding 4's coupons | | | |
| paid and held by Soo Line | | 1,142,260 | 1,142,260 |
| Unsecured claim | 750,000 | | 750,000 |
| | | | $59,231,941 |

There are outstanding 112,659 shares of preferred stock of a par value of $11,265,900, and common stock of the par value of $16,126,300.

The plan approved by the Commission provides for a capitalization of $58,947,900, subject to minor adjustments in accordance with the provisions of the plan, represented by 4% fixed interest first mortgage bonds of $14,706,900, 4½% contingent interest general mortgage bonds of $20,441,000, common stock, no par, with a stated value of $100 per share in the amount of $20,800,000 and equipment obligations which remain undisturbed in the amount of $3,000,000. The plan recognizes that the amount of outstanding equipment obligations will fluctuate from time to time and at consummation date may be more or less than $3,000,000, but adopts that figure for purposes of the plan as a fair average without thereby in any way precluding the Court from approving the issuance of additional equipment obligations prior to consummation of the plan with a consequent increase in the total capitalization of the reorganized company. In view of Order No. 132–A recently entered in these proceedings, it appears probable that on consummation of the plan equipment obligations will be outstanding in an amount exceeding $3,000,000.

The annual fixed charges under the plan are $718,276, comprised of $60,000 for leased railroad and equipment, $70,000 for interest on equipment obligations and $588,276 for interest on the new fixed interest first mortgage bonds. Annual contingent interest charges on the new general mortgage bonds amount to $919,845. In addition, the annual sinking fund payments are $175,740 which is computed upon the basis of ½ of 1% of the total principal of both fixed and contingent interest bonds.

On the assumption made in the plan that the cash position of the debtor on the consummation date will be sufficient, according to the formula set forth in the plan, to permit a $100 (but no greater) cash distribution on the principal of each present-

1. Includes only interest computed at 4% per annum both before and after maturity in conformity with the stipulation of the parties dated May 12, 1952, and Order No. 128 entered on such stipulation. The Commission's finding that the value of the property subject to the lien of the Superior and Duluth mortgage does not exceed $10,000,000 is approved.

Consequently, $3,400,000 of the total interest claim of the Superior and Duluth mortgage bondholders is unsecured.

2. The claims of the Soo Line against the debtor have been allowed in the foregoing amounts subject to the reservation of jurisdiction to vacate such allowance under the circumstances hereinafter described.

ly outstanding $1,000 First General Mortgage bond of the debtor, the plan provides for the following allocation of cash and new securities: each $1,000 First General Mortgage bond is to be allocated $100 in cash and $900 principal amount of new fixed interest first mortgage bonds; each $1,000 Superior and Duluth Mortgage bond is to be allocated on account of its secured claim $150 principal amount of new fixed interest first mortgage bonds, $550 principal amount of new contingent interest general mortgage bonds and eight shares (stated value $100 per share) of new common stock; each $1,000 Refunding 4% bond is to be allocated $150 principal amount of new fixed interest first mortgage bonds, $1,000 principal amount of new contingent interest general mortgage bonds and five shares of new common stock; each $1,000 Refunding 5% bond is to be allocated on account of its secured claim $150 principal amount of new fixed interest first mortgage bonds, $1,050 principal amount of new contingent interest general mortgage bonds and seven shares of new common stock. The Soo Line, for its secured and unsecured claims, will receive 23,850 shares of new common stock. There will be left for allocation among the unsecured claims of the Superior and Duluth Mortgage bondholders and the Refunding 5% bondholders a total of 25,070 shares of new common stock which will permit an allocation of approximately two shares to each $1,000 Superior and Duluth Mortgage bond and one share to each $1,000 Refunding 5% bond. The reorganization managers, with the approval of the Court, will determine the exact allocation of new common stock upon the unsecured claims of these bondholders.

The plan contains appropriate provisions for alternative allocation of cash and new securities in event the cash position of the debtor on consummation date is insufficient to permit the $100 cash payment on each presently outstanding $1,000 First General Mortgage bond or is sufficient to permit an even greater distribution in multiples of $100 per $1,000 First General Mortgage bond. If the $100 cash distribution cannot be made, each $1,000 First General Mortgage bond will receive $1,000 principal amount of new first mortgage bonds, and each $1,000 bond of all other classes will receive $50 less principal amount of new first mortgage bonds and one-half share more of new common stock. On the other hand, for each additional $100 cash distribution that can be made, each $1,000 First General Mortgage bond will receive $100 less principal amount of new first mortgage bonds, and each $1,000 bond of all other classes will receive $50 more principal amount of new first mortgage bonds, and one-half share less of new common stock. Consequently, there may be either more or less common stock available for distribution upon the unsecured claims of the Superior and Duluth Mortgage bondholders and of the Refunding 5% bondholders.

The plan provides that if all unsecured creditors receive new common stock having a stated value equal to 120% of their claims, any remaining new common stock shall be distributed to the holders of the present preferred stock of the debtor on a pro-rata basis, and that to the extent not so satisfied, the equities of the holders of the debtor's preferred and common stocks have no value, and nothing shall be distributed to them in this reorganization.

The order of this Court allowing the Soo Line claims in part pursuant to the compromise agreement of May 12, 1952, contemplates that such order will be vacated and the Soo Line claims litigated to a final conclusion in event that any time prior to consummation of this reorganization it appears that complete disallowance of such claims or complete subordination of such claims to other claims against and interests in the debtor in the order of their priority would result in any participation by preferred stockholders of the debtor in this reorganization. The unsecured claims against the debtor, exclusive of the claims of the Soo Line, amount to $5,375,000. It would require 64,500 shares of new common stock to satisfy those claims at the rate of $120 of stated value of new common stock per $100 of claim. On the assumption of a cash distribution of $100 per $1,000 First General Mortgage bond,

there are available under the plan only 48,920 shares of new common stock for such unsecured claims even if the Soo Line claims were to be completely disallowed or subordinated. Each additional $100 cash payment per $1,000 First General Mortgage bond would make available for this purpose an additional 11,658 shares of new common stock. It would require a cash distribution of $300 per $1,000 First General Mortgage bond (viz., a total cash distribution of $3,736,500 on such bonds) before there could be any distribution of any common stock to the present preferred stockholders of the debtor, even if the Soo Line claims were to be completely disallowed or subordinated to other claims against and interests in the debtor in the order of their priority.

The order allowing the Soo Line claims reserved for subsequent determination the contention of the holders of the Refunding 5% bondholders that they are entitled in respect of their unsecured claim for interest at the rate of 1% per annum (viz., for $1,975,000 as of the effective date of the plan) to be subrogated to any securities to be allocated to the Soo Line in any plan of reorganization of the debtor. This contention has not yet been brought on for hearing. To the extent, if any, that such contention is hereafter successfully asserted, there would be a reallocation as between the Soo Line and the Refunding 5% bondholders of the new common stock allocated to them under the plan, such reallocation being in favor of the Refunding 5% bondholders. The plan, with the slight modification thereof hereinafter approved, will contain adequate provisions for determining the exact reallocation, if any, to be made in accordance with principles to be hereafter established in this Court's decision upon such contention and for carrying such reallocation into effect.

■■ Proceedings before the Commission on plans for reorganization of the debtor began in 1945. On June 3, 1947, the Commission approved a plan as of that date, but thereafter, upon application of the parties, who among other things objected that the capitalization was inadequate, reopened hearings in 1949. The

hearings, briefs, and arguments before the Commission during these years have furnished that body an exhaustive analysis and consideration of all factors which bore upon a fair and equitable plan of reorganization. At the outset, it seems elementary that the questions of capitalization and valuation are matters primarily within the province of the Commission. Experienced examiners have heard the evidence over these several years, and they have considered and appraised the voluminous testimony and records which have been presented at the various hearings. That there is substantial evidence to support the Commission's finding of valuation and capitalization and that the Commission applied legal standards in arriving at its conclusions is not successfully challenged by the objectors. Under such circumstances, the reorganization court should not disturb the findings and conclusions of the Commission as to valuation and capitalization. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 1943, 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959; R. F. C. v. Denver & R. G. W. R. Co., 1946, 328 U.S. 495, 66 S.Ct. 1282, 90 L.Ed. 1400.

■ Reference is made by the objectors to the conservatism of the 1948 forecast made by the Trustee, which forecast was based primarily upon the testimony of one Harold J. McKenna, an assistant general freight agent, and the subsequent finding of the Commission as reflected in its opinion that the income available for fixed charges before income taxes should be estimated at $3,150,000. The objectors emphasize that that forecast markedly exceeds the amount forecast by McKenna, and it is argued, therefore, that notwithstanding their repudiation of McKenna's forecast, the Commission did give some credence to certain aspects of McKenna's testimony and that this was error because McKenna was incompetent to testify as an expert. However, it seems clear that it was for the Commission to determine the weight to be given to McKenna's testimony. Merely because the Commission rejected certain of his views does not es-

tablish that he was incompetent to testify. In view of the Commission's vast experience in appraising the weight to be given to the testimony of expert witnesses in railroad reorganizations, it is not for this Court to review the weight to be attached to an expert's testimony. Moreover, there was other competent evidence with respect to the earning power of the debtor upon which the Commission could and did rely in arriving at its own forecast. The admission of McKenna's testimony cannot, under any circumstances, properly be said to have had any prejudicial effect upon the Commission's conclusions.

 Objection is made to the Commission's capitalization formula. As stated, the annual earnings were estimated by the Commission at $3,150,000. After taxes, based upon the assumption of an income tax rate of 45%, the Commission concluded that there would be $2,469,600 in earnings. On a capitalization of $58,947,-900, this would reflect a capitalization rate of 4.19%. The objectors assume to compare this rate with the capitalization rate of certain major railroads, which also have been in reorganization before the Commission. But a comparison with the capitalization rates of major railroad companies in reorganization is in no way determinative of the rate which should be applied here. All factors and circumstances, and particularly those pertinent to this debtor in its relatively limited railroad operations, must be considered. There is no legally fixed rate of capitalization. In other railroad reorganizations somewhat comparable, and which were in this Court, it may be noted that the capitalization rate of 4.5% for the Minneapolis, St. Paul and Sault Ste. Marie Railway, and an approximately 4% capitalization rate for the Duluth, South Shore and Atlantic Railway, were approved. Moreover, if a 52% tax rate is assumed herein, the capitalization rate would be 4% instead of 4.19%. Not only have the objectors failed to establish that the Commission did not follow legal standards in arriving at the capitalization formula, but the plan itself would seem fully to sustain the appropriateness of the formula. The First Mortgage bonds bear interest at 4% and the contingent interest bonds at 4½%. The annual sinking fund, as heretofore stated, requires a setting aside of ½ of 1% of the total principal of the fixed and contingent interest bonds. Consequently, if consideration is given to the dividends which must be paid on the new common stock in order to satisfy the claims of the junior secured claims and the unsecured claims, the Commission's capitalization rate seems persuasively sound.

Nor is there any merit to the objectors' contention that the stock allotment to the Refunding 4's and 5's and Superior and Duluth bonds and to the Soo Line is excessive. A mere stated value of $100 a share for the new stock which is to be issued does not determine that the junior secured bondholder receives for every $100 of his secured claim a security of the same quality. That there is a qualitative inferiority in the stock to be issued as compared to the security secured by a lien seems too evident for any serious question. There must be, therefore, in the issuance of the common stock a quantitative adjustment so as to meet the requirements of the junior secured creditors' superiority and priority. Common fairness suggests that the present stockholders should not be permitted to participate in this reorganization at the expense of either secured or unsecured creditors. Moreover, any additional stock issued to the present preferred stockholders would further dilute the quality of the stock received by these junior secured claims.

 There is no substance to the objectors' suggestions that some provision should be made for the present stockholders on the speculative possibility that the future earnings of the road might justify a higher capitalization, and that therefore the capitalization should be increased to accommodate a junior class of stock for the present stockholders. As the court stated in Ecker v. Western Pacific Railroad Corp., supra, 318 U.S. at page 476, 63 S.Ct. at page 709, "A mere possibility that traffic might be found to the limit of the physical capacity of the system is not the kind of earning power which justifies

the issue of securities based upon such a possibility." This railroad never has been able to pay any dividends on the common stock since it was issued in 1899. No dividends have been paid on the preferred stock since 1921 and there may be a grave question as to whether dividends were actually earned during all the years when they were paid between 1908 and 1921. True, this road has improved in a physical, operative and financial sense from what it was when it entered into receivership in the depression days of 1932. Dieselization of the road, the improvement of its roadbed, and the quality and amount of the rolling stock are evidence of the progress which has been made. Moreover, its earnings have increased during the war years and the inflationary period which has followed. During the reorganization, the First General mortgage debt has been reduced from $20,200,000 in 1947 to a present $12,500,000. Interest in the sum of $15,399,076 has been paid on the First General Mortgage bonds. But, notwithstanding the progress which has been made in paying first general mortgage interest and reducing the principal of that debt, the unpaid interest on the Superior and Duluth and the Refunding bonds as of July 1, 1952, amounted to $20,369,640. Thus while the principal amount of the mortgage debt has been decreased by about $8,000,000, equipment obligations have been incurred and will be still further increased, and unpaid bond interest of over $20,000,000 has accrued. Obviously, this unpaid interest must be capitalized in any plan of reorganization of the debtor before the stockholders are entitled to participate in the plan. But with all the improvements in the Wisconsin Central operations, it must be remembered that relatively the same economic factors now prevail which have controlled the earnings of the road during the past twenty years. The cycle of poor times and hence poor earnings in the future is as inevitable as the past history of this company reflects. It is significant that in only one of the last four years, viz., 1950, did the debtor's earnings before fixed charges and federal income tax accruals equal or exceed the Commission's forecast.

The annual requirements for fixed and contingent interest and the sinking fund under the Commission's plan total $1,813,861. The annual requirement of fixed interest under the old capitalization was only slightly in excess of that sum. When one reviews all the records of the road as reflected during the past twenty years that it has been operating in receivership and reorganization, it becomes readily apparent that, if the new stock to be issued under the plan is to offer any earnings to the claims of existing creditors, a sustained earning income substantially in excess of the annual bond requirements must be had. Future earnings of the road must be appraised by giving due consideration to the potentials which reflect the road's earning capacity. The national economy is not the controlling criterion for such forecasts. The future of the Wisconsin Central is geared largely to the prosperity which is to be found in the agricultural, timber, and mining area through which it operates. And to speculate on the duration of the cold war and other uncertain factors affords but little substance to the attack made on the Commission's findings as to valuation and capitalization. The finality of the Commission's findings as to these matters when legal standards have been followed is the crux of the teaching of the Supreme Court in Ecker v. Western Pacific Railroad Corp., supra.

The debtor urges that the Commission should have directed the Canadian Pacific to disclose all of the circumstances relating to its acquisition of the debtor's securities since the date of the filing of the petition for reorganization herein. The Canadian Pacific is referred to by the debtor as the dominant party to this proceeding. True, the Canadian Pacific may be placed in control of the reorganized company when and if the Commission's plan for reorganization becomes effective. But there is no substance to the suggestion that there are equitable considerations which require the disclosure of the acquisition of securities by this company since September 30, 1944, or that it has dominated these proceedings or the plan. The original plan of reorganization was first proposed by the First

General Bondholders Committee and the Trustee of the First General mortgage. That there was conflict of interest between this proposing group and the Canadian Pacific, and also between the Canadian Pacific and the Superior and Duluth Mortgage bondholders who presented the other plans principally considered by the Commission, is evidenced from the litigation which ensued in this Court over the mortgage liens of the First General mortgage and the Refunding mortgage and from the proceedings before the Commission with respect to plans of reorganization. The Canadian Pacific has never been in control of the debtor since the petition for reorganization was filed. The title to all the property of the road vested in the Trustees, and later the Trustee, who were approved by this Court. The Board of Directors of the debtor has had no control over the affairs of this road, neither during the time that the Soo Line was in possession of voting control nor since May 5, 1950, when the preferred stockholders had elected a majority of the Board of Directors. The Canadian Pacific Railway has never, by reason of its relation to the Soo Line, obtained information about the affairs of the Wisconsin Central which was not available to any other claimant herein. This Court in prior proceedings has found in considering the petition of the Preferred Stockholders Committee and the Superior and Duluth Committee for leave to file objections to the claim of the Canadian Pacific Railway, that there was an absence of any showing which "would suggest that the Canadian Pacific wrongfully dominated the Soo, and through it the Wisconsin Central." See order of this Court dated May 23, 1949. The present contention of the objectors in this regard likewise is devoid of any real substance. Since the petition for reorganization was filed, the debtor has been a mere corporate shell. The Canadian Pacific Railway has not occupied any fiduciary relation to the debtor during the reorganization. There is an utter absence of any fact or circumstance which would prevent the Canadian Pacific from purchasing in the open market securities of the debtor, and it is not made to appear that

any inequitable consequence would result to other claimants or to the public interest by reason of such purchases. The Commission which had full opportunity to weigh the position and duties of the Canadian Pacific in this reorganization proceeding, has repeatedly reached the same decision. The authorities cited by the debtor involved very different situations.

■ The debtor complains because the Commission refused to hold a new hearing on its plan which was dated May 16, 1951. This plan was filed after the conclusion of the hearings before the Commission. However, due consideration was given to the debtor's plan by the Commission in its report. There was no necessity for further hearings on the debtor's plan in view of these circumstances. The debtor, under a reasonable interpretation of Section 77, sub. d, of the Bankruptcy Act, 11 U.S.C.A. § 205, sub. d, had no absolute right to delay the filing of its plan until after the hearing on the plan regularly before the Commission, and then demand a new hearing. And moreover, as a practical matter, no possible prejudice has resulted from the Commission's ruling in this regard. The debtor in its participation in the reorganization proceedings speaks for no one but the preferred stockholders. The Preferred Stockholders Committee did propose a plan which was before the Commission. Mr. Weber, as counsel for the Preferred Stockholders Committee, and later as counsel for the debtor, has participated actively in all of the reorganization proceedings since 1949. The suggestion, therefore, that the Commission should have reopened the hearings when the debtor belatedly filed its plan is without merit.

Reference is made by the objecting debtor to Order No. 122 of this Court which approved a compromise of certain Soo Line claims against the debtor and which allowed a secured claim to the Soo Line of $1,142,260 and an unsecured claim in the amount of $750,000. All claimants except the stockholders have approved this compromise. The debtor in objecting to the compromise necessarily could speak for

no one but the stockholders. This Court found:

"If the Plan of Reorganization of the Debtor proposed in the Supplemental Report and Order of the Interstate Commerce Commission of March 17, 1952, were to be approved, confirmed and consummated at this time, none of the stockholders of the Debtor would participate in the Plan of Reorganization of the Debtor even if said claim of the Soo were to be disallowed in full or completely subordinated to the claims of other creditors and stockholders of the Debtor in accordance with their priority."

This Court's order approving the compromise and allowing the claims of the Soo Line in accordance therewith contains the following provision:

"This order and the allowance of the claim of the Soo against the Debtor made herein is without prejudice to the right of the Debtor or any of its stockholders to have this order vacated and the proceedings with respect to the said claim of the Soo and the objections thereto reopened in event at any time prior to the final approval, confirmation and consummation of a Plan of Reorganization of the Debtor, the Debtor or any of its stockholders shows to this Court that some or all of the stockholders of the Debtor will participate in such Plan of Reorganization if the said claim of the Soo were to be disallowed in part or in full or completely or partially subordinated to the claims of other creditors and stockholders of the Debtor in accordance with their priority."

The debtor now complains because it is barred from interposing its contentions that the Soo claims should be subordinated to the claims of the stockholders. But there is no purpose in discussing any claimed right of subordination of the Soo Line claim to the claims of the stockholders. The indubitable fact, as shown above, is that even though the Soo's claims were subordinated to the claims of other creditors and stockholders, none of the present stockholders could participate in the present plan of reorganization of the debtor unless a $300 cash payment per $1,000 First General Mortgage bond is made. If that payment is made, the debtor will have full opportunity to contend that the Soo Line claims should be subordinated.

It has taken twenty years of receivership and reorganization under the Bankruptcy Act for this road to come before this Court finally on a plan of reorganization which will permit it to be restored to private operation. As the court stated in Ecker v. Western Pacific Railroad Corp., supra, 318 U.S. at pages 481–482, 63 S.Ct. at page 711, "Sound railroad reorganization involves more than the partitioning of assets among creditors with valuable claims and the distribution to creditors and stockholders without equity of so-called securities representing chances for then unforeseeable profits. The interest of the public in an adequate transportation service must receive consideration." Sound financing as reflected in this plan fulfills the duty to the public as well as to the creditors and stockholders. The relative improvement in the road's position as compared to what it was when receivership intervened does not warrant a disregard of past fluctuations in earnings of the road or the other basic factors which must be realistically considered in forecasting future earnings.

The Court has duly considered all of the objections and claims for equitable treatment embodied in the objectors' petition and finds them without sufficient merit to disturb the Commission's findings and conclusions herein. I am of the opinion that the plan is fair, equitable, and nondiscriminatory, that there is substantial evidence to support the Commission's findings, that legal standards were applied in arriving at its conclusions, and that the plan complies with Sub-section b of Section 77 of the Bankruptcy Act.

Under the plan, it is provided that the Court "may cure any defect, supply any omission, or reconcile any inconsistency in such manner or to such extent as may be necessary or expedient to carry out the plan effectively." It appears that there are

certain minor defects, omissions and inconsistencies in the plan arising from inadequate presentation of certain facts to the Commission which may and should be cured by the following modifications of the plan which are consistent with the plan as a whole and will not require its reference back to the Commission.

The plan does not provide any treatment for the interest coupons which had matured prior to December 2, 1932, when an equity receiver was appointed for the debtor, and which are not paid prior to the consummation of the plan because not presented for payment. Similarly, the plan does not expressly provide any treatment for the interest accrued or to accrue on the First General Mortgage bonds of the debtor in the equity receivership proceeding or in this reorganization proceeding and which is not paid prior to the consummation of the plan because not presented for payment. It is evident, however, from the plan as a whole that all such interest should be paid in cash prior to consummation of the plan or that proper provision should be made for such payment on the consummation date.

Furthermore, the plan treats the $20,940 aggregate amount of interest coupons which matured April 1, 1933, to October 1, 1937, both dates inclusive, on the Refunding 4% bonds of the debtor and which were not acquired by the Soo Line pursuant to its guaranty of such interest coupons as being apportioned equally among all outstanding 5,816 Refunding 4% bonds instead of as applying in varying amounts on approximately 274 of such bonds. In view of the small amount of such interest, the practical difficulties of providing fair treatment thereof through the issuance of script, the fact that the holders of other coupons of the same maturity received payment in cash from the Soo Line, and the lack of objections to the suggestion made by counsel for the Trustee at the aforesaid hearing on the plan (all objections then made having since been withdrawn), the Court concludes that proper provision should also be made in the plan for payment of such coupons in cash on the consummation date.

Therefore, the plan should and will be modified to provide for payment in cash on the consummation date of all interest discussed in the preceding two paragraphs. The plan grants to the reorganization managers, with the approval of this Court, power and authority to provide the proper mechanics for such payment. Such mechanics should include a provision for the deposit of the necessary cash for such payment with a paying agent with proper instructions for payment of such interest. Since it is probable that many of such claims for interest will not be presented for some years and that some of them may never be presented, the Court believes that such paying agent should hold the cash so deposited with it and not disbursed in payment of such interest for a period of time from the consummation date to be designated by the Court, after which all such undisbursed cash should be returned to the reorganized company. The reorganized company would, of course, remain liable for such interest without, however, any necessity for segregating or holding such cash so returned to it as a trust fund. In view of the fact that the Commission's said error in computing the claim of the Refunding 4% bonds amounts to only $3.60 per bond, no change need be made in the allocation of securities to the holders of such bonds. The Court finds that such treatment of such interest claims and of such bonds is fair, equitable and fully sustained by the record.

Reference has already been made to the reserved contention of the Refunding 5% bondholders that they are entitled in respect of their unsecured claim for interest at the rate of 1% per annum to be subrogated to any securities to be allocated to the Soo Line. Probably such contention can be fully determined prior to consummation of the plan. The plan should, however, include an adequate provision for escrowing upon consummation of the plan any new common stock involved in such contention if such contention has not then been fully determined. The plan now contains a provision for escrowing new common stock allocated to the unsecured creditors if their claims are still in dispute on consummation date. This provision should and will be broadened to include the new common stock allocated to the Soo Line in respect of its

secured claim based on its acquisition of Refunding 4% interest coupons.

It follows from the foregoing that the plan certified by the Interstate Commerce Commission as modified as aforesaid will be approved, and that the objections and claims for equitable treatment filed herein will be overruled and denied. The Interstate Commerce Commission now is considering the various fee applications for the purpose of fixing the maximum limits. The approximate amounts to be paid by the debtor or by the reorganized company for expenses and fees incident to the reorganization have been fully disclosed, as far as they could be ascertained at the date of said hearing on the plan, are within such maximum limits as shall be fixed by the Commission, and are, within such maximum limits, to be subject to the approval of this Court, and will be approved only to the extent determined to be reasonable.

Findings of fact and conclusions of law in harmony herewith may be presented by counsel for the Trustee upon five days' notice.