**In the Matter of The CENTRAL RAILROAD COMPANY OF NEW JERSEY, Debtor.**

**No. B 401–67.**

United States District Court, D. New Jersey.

July 3, 1979.

Stanley Weiss, Carpenter, Bennett & Morrissey, Newark, N. J., for Trustee Robert J. Timpany.

WHIPPLE, Senior District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON APPLICATION OF THE TRUSTEE FOR APPROVAL OF HIS AMENDED PLAN OF REORGANIZATION

### A. *Introduction*

1. The Central Railroad Company of New Jersey (Debtor) filed a petition for reorganization under § 77 of the Bankruptcy Act on March 22, 1967 and was operated as a railroad by successive trustees until March 31, 1976 when most of its rail assets were conveyed to ConRail pursuant to the Regional Rail Reorganization Act of 1973, as amended, 45 U.S.C. § 701, *et seq.* (the "Rail Act"). The retained assets have thereafter been administered by the present Trustee.

2. On June 1, 1976 the present Trustee filed a Plan of Reorganization which was subsequently held to be illegal in a number of material respects. *In re Central Railroad Company of New Jersey*, 425 F.Supp. 1055 (D.N.J.1976); *vac. and rem.* 579 F.2d 804 (3d Cir. 1978). On December 9, 1978 the Trustee filed an amended plan; and on May 31, 1979 the Trustee filed an amendment to the amended plan (as amended "Amended Plan"). This Court entered an order scheduling hearings on the Amended Plan for June 26, 1979. Affidavits of counsel are on file with the Court with respect to the giving of notice of the Amended Plan and the Amendment thereto and these hearings. In considering the Amended Plan, this Court has applied, where applicable, the provisions of § 77 of the Bankruptcy Act, the provisions of § 601(b) of the Rail Act, and the Rules of the United States Supreme Court effective August 1, 1976 governing § 77 proceedings.

### B. *CNJ'S Financial Condition*

3. The present assets of the estate largely consist of cash and receivables, real estate holdings, securities of subsidiaries, and various claims. The cash on hand and in various special accounts held by the Reorganization Trustee and the Indenture Trustee approximates $30 million. This amount includes the receipt by the Trustee in February, 1979 of approximately $2.5 million arising out of a recent condemnation by the State of New Jersey of approximately 50 acres formerly owned by the Debtor in Elizabeth. The 50 acres are to be used in connection with a highway interchange to be built for the New Jersey Turnpike. The remaining CNJ real estate consists of approximately 550 acres of land situated in various localities throughout the State and approximately 69 miles of right-of-way (including the track and other appurtenances thereon) owned by the Debtor and its subsidiaries. Included within the 550 acres of real estate are 240 acres which are under long-term lease to the Port Authority of New York and New Jersey and generate approximately $900,000 a year in net rentals to the estate. Detailed information concerning securities of subsidiaries owned by the Debtor and the land and rights-of-way owned by the Debtor and its subsidiaries in June of 1976 was set forth in Schedules A, B and C of the Plan of Reorganization filed by the Trustee on June 1, 1976. Information concerning material sales of property since such date can be found in the periodic reports filed with the Court by the Trustee. The testimony of CNJ's Court appointed real estate appraiser and sales agent who is

thoroughly familiar with the properties, places the value of the real estate and rights-of-way still owned by the Debtor and its subsidiaries at between $15 million and $30 million, depending upon the circumstances of sale. The Trustee, for many years, has been trying to sell the principal properties other than the 240 acre parcel leased to the Port Authority.

4. The principal claim owned by the estate is its claim for compensation for the transfer of most of its rail assets to ConRail under the Rail Act, which claim is presently being prosecuted by the Trustee in the Special Court created by the Rail Act with exclusive jurisdiction to adjudicate the matter. The Final System Plan issued under the Act valued CNJ's conveyed assets (including those of its subsidiaries) at $10.3 million; the Trustee contends that the market value of CNJ's interest in the conveyed assets approximates $100 million; and the Special Court has expressed skepticism about the Final System Plan's valuation of the assets conveyed and suggested that in the absence of adequate proof of market value, it might consider book values less reductions for deterioration as a principal valuation measure. *In re Valuation Proceedings Under the Regional Rail Reorganization Act of 1973*, 445 F.Supp. 994, 1029 (Sp. Ct. RRRA, 1977). CNJ's balance sheet reports the book value of its conveyed assets at $63.3 million and reflects as well an investment in subsidiaries and other companies of $5.6 million.

5. The estate has a number of other claims as well. There are two claims presently pending in the state courts of New Jersey to recover amounts in excess of the deposits made by the State of New Jersey in the course of condemning approximately 350 acres of land formerly owned by the estate in Jersey City taken for development of Liberty Park and approximately 50 acres of land taken for the Turnpike interchange. The Trustee is seeking about $18 million more, principally in the Liberty Park matter; and the State of New Jersey denies anything further is owing. The Trustee has various other claims (which have previously been the subject matter of extensive petitions before this Court) against the State of New Jersey, arising out of prior subsidy arrangements, which he proposes to release as part of the Amended Plan of Reorganization, as well as certain claims reflected in its open accounts receivable and against ConRail.

6. These assets are charged with substantial liabilities to creditors. Creditor claims include (a) over $5.3 million in principal and interest on unpaid trustee certificates; (b) approximately $24.7 million in anticipated § 211(h) claims (including for purposes of the plan $724,000 for railroad retirement and $700,000 for freight car rental owed to the United States) (which the Amended Plan proposes to settle for $22.5 million); (c) approximately $30.1 million in other liquidated administration claims including taxes and unpaid interest on taxes at December 31, 1978; (d) a potential administration claim of the United States for the expenses incurred in taking down the Newark Bay Bridge which it has estimated at $14 million; (e) pre-bankruptcy secured claims of general mortgage bonds consisting of $42,890,000 in principal and $16,822,254 in accrued interest at December 31, 1978; (f) pre-bankruptcy secured claims on two collateral trust notes held by the United States for $12,386,398 in principal and $9,970,533 in interest at December 31, 1978; (g) the claims of possible six month creditors which the Trustee estimates at approximately $1.8 million; and (h) the claims of other pre-bankruptcy creditors which the Trustee estimates at approximately $5.4 million. These claims exceed $163 million.

7. In addition to these claims, further charges on the estate include such allowances for fees and expenses as may be allowed by the Court under § 77(c)(2) and (c)(12), various current obligations routinely incurred by the Trustee's administration, accruals on the enumerated claims since January 1, 1979, and various disputed claims asserted against the estate—principally by the State of New Jersey (which will release such claims if the Amended Plan is approved) and by ConRail. There is

additionally an administrative obligation totaling $250,000 at April 30, 1979 incurred pursuant to the interline settlement agreement approved by Order No. 866. This claim is being paid monthly and is expected to be discharged by August.

8. The Debtor reported substantial losses in operations prior to filing its petition for reorganization in 1967; and the losses continued throughout the administration of the estate and resulted in the large accruals of administration claims that have been earlier summarized. The size of the accrued administration claims—relative to the lesser assured values of the retained assets—led this Court to conclude in its opinion of March 31, 1976, disposing of the § 211(h)(3) hearings required by the Act, that there was a risk that the administration of the estate itself may be insolvent. Were this the case, all administration claims would not be paid in full and pre-bankruptcy debt secured and unsecured would receive nothing on their claims.

9. As a result of the continued losses in operations, the Debtor accumulated substantial tax loss carryforward which totalled approximately $63 million when it ceased operating as a railroad in 1976. The financial reports periodically submitted by the Trustee to the Court and the parties since the conveyances to ConRail reflect that the annual losses have declined as the rental income from the estate's properties and the interest income on its cash reserves routinely exceed the estate's ongoing administrative expenses—though such income has not been sufficient to cover as well the continuing large accruals of interest on pre-bankruptcy funded debt and post-bankruptcy real estate taxes. By January 1, 1979 approximately $35 million of the former $63 million in tax loss carryforwards had expired. However, Section 374(e) of the Internal Revenue Code preserves such expired loss carryforwards for application against any gain that may be recognized on the proceeds to be received for the conveyances to ConRail under the Rail Act. The expired loss carryforwards appear adequate to cover any gain the estate may realize over the $63 million in book value of the CNJ assets transferred to ConRail plus CNJ's interest in the assets of its subsidiaries so transferred.

## C. The Amended Plan of Reorganization

10. The Amended Plan evolved out of a lengthy series of negotiations among the Trustee and representatives of the principal administrative and secured creditors of the estate; i. e., the United States, the State of New Jersey and the general mortgage bondholders. As such, the Amended Plan is essentially a consensual one, proposed with the agreement of the persons largely entitled—both by priority and amount—to the reasonably foreseeable assets of the estate. The three creditors involved in the negotiations represent claims which are expected to total over $148 million of the approximate $163 million in claims against the estate. The remaining claims consist of approximately $7 million owed on local taxes, about $7.2 million in pre-bankruptcy unsecured and six-month claims, and the balance to various other administrative creditors. In addition, there are the Debtor's stockholders; but they would only be entitled to participate in the event of a very large recovery in the valuation case pending in the Special Court.

11. In summary the Amended Plan provides:

(a) to pay in cash the trustee certificates, allowances, current expenses of the Trustee, and certain interline installment payments provided for by Order No. 866;

(b) to reduce by settlement the amount of the potential § 211(h) debt from approximately $24.7 million to $22.7 million and to pay such debt as reduced and actually incurred by the issuance of notes of the reorganized company in an approximate amount of $19 million with the balance to be paid in cash. The notes will consist of a contingent, non-recourse V–2 Note for $8 million payable out of the valuation proceeds together with interest on December 31, 1987 and Series A Notes, bearing interest at 8% compounded annually, and secured by a first lien on all the assets of the

reorganized company in an estimated amount of $11 million. As with the V–2 Note, payment of interest and principal on the Series A Notes is to be deferred pending receipt of the proceeds of the valuation case; and the Trustee hopes, though there can be no assurance, that such proceeds will be more than sufficient to satisfy the Notes in full;

(c) to offer to other administration claimants (except for the claim of the United States with respect to the Newark Bay Bridge) the option to accept either (i) Option B, a cash payment of 40% of their claims, as determined pursuant to the Amended Plan, plus 15% in a Series V–1 Note secured by a first lien on the proceeds of the condemnation cases pending with the State in excess of the original deposit and a first lien on the proceeds of the valuation case, or (ii) Option A, Series B Notes for the principal of their claims and Series C and G Notes for their interest claims. The Series B Notes are to be fixed obligations of the reorganized company, secured by a second lien on all the assets of the reorganized company, bearing interest at 7% compounded annually. Both principal and interest on the Series B Notes are to be paid over a nine-year period. The Series C Notes are to be contingent, non-recourse notes bearing 8% interest compounded annually, payable out of the proceeds received from the valuation case. The Series G Notes are also to be contingent, non-recourse notes bearing 8% interest compounded annually payable out of the valuation proceeds if they are sufficient to satisfy the V–1, V–2, Series A, Series C, Series D, Series E and Series F Notes;

(d) to issue Series D Notes to the United States for its expenses (estimated by it at $14 million) in taking down the Newark Bay Bridge. The Series D Notes are to be contingent, non-recourse notes, bearing interest at 8% compounded annually, and are to be payable solely out of the valuation proceeds to the extent the amount of such proceed exceeds $8 million plus accrued interest and then solely to the extent of $1 out of every $3 in proceeds in excess of such $8 million plus accrued interest;

(e) to pay the six-month creditor claims with Series E Notes which are to be contingent, non-recourse notes, bearing interest at 8% compounded annually, and which are to be paid out of the valuation proceeds to the extent they are sufficient after the payments required on the Series V–1, V–2, A, C and D Notes;

(f) to pay the unpaid interest on the general mortgage bonds and the collateral trust notes with Series F Notes which are to be contingent, non-recourse notes, bearing interest at 8% compounded annually, and which are to be paid out of the valuation proceeds to the extent they are sufficient after the payments required on the Series V–1, V–2, A, C, D and E Notes;

(g) to pay 50% of the principal on the general mortgage bonds and the collateral trust notes with Series H Notes which are to be contingent, non-recourse notes, bearing interest at 8% compounded annually, and which are to be paid out of the valuation proceeds to the extent they are sufficient after the payments required on the Series V–1, V–2, A, C, D, E, F and G Notes;

(h) to pay the unsecured creditors with Series I Notes which are to be contingent, non-recourse notes, bearing interest at 8% compounded annually, and which are to be paid out of the valuation proceeds to the extent they are sufficient after the payments required on the Series V–1, V–2, A, C, D, E, F, G and H notes;

(i) to pay the Debtor's stockholders with certificates of contingent interest which shall entitle the holders to the balance, if any, of the valuation proceeds;

(j) to distribute approximately 1,560,000 shares of common stock of the reorganized company to holders of the general mortgage bonds and 420,000 shares of such common stock to the United States as the holder of the collateral trust notes in satisfaction of 50% of the unpaid principal on such bonds and notes. It is anticipated that the reorganized company will beneficially succeed to all the remaining assets of the estate—an estimated $7 million in cash (if claimants entitled elect Option B) the re-

tained real estate, rights-of-way, securities, and certain claims other than the claim for the valuation proceeds which shall be held and prosecuted in trust for the benefit of the holders of the various series of notes and certificates of beneficial interest issued under the Amended Plan. The principal obligations of the reorganized company will be the Series A Notes expected to total $11 million and, to the extent Option B is not taken, the Series B Notes;

(k) the estate and the State of New Jersey are to release each other from all claims against each other except for the claims, which the reorganized company shall own, that are presently pending in the New Jersey State Courts for additional compensation arising out of condemnations of the Debtor's property for the Liberty Park and New Jersey Turnpike interchange projects.

12. The Amendment Plan basically seeks to achieve three laudable goals. First, it seeks to create a reorganized company around the retained assets of the estate and, recognizing that such assets are insufficient to satisfy all administration and secured claims, to dedicate (with the consent of prior claimants) the ownership of such company to the secured creditors in partial satisfaction of their claims. Second, realizing that the size of the valuation recovery is presently indeterminate, it seeks to preserve the opportunity of all to receive satisfaction on their claims until the valuation recovery is received and ·provides for the application of such proceeds to the unsatisfied claims in accordance with proposed priorities. Finally, it seeks to resolve on a compromise basis a broad range of disputed issues which might otherwise need be litigated if the Amended Plan were not implemented.

13. The disputes which the Amended Plan seeks to settle or otherwise moot are: (1) the present ownership of the Newark Bay Bridge and responsibility for the costs of its removal, (2) the principal amount of state and local taxes that should properly be assessed against the estate in light of the conveyances to ConRail, (3) the extent, if any, to which interest should be allowed on such taxes, (4) the ultimate responsibility for the funding of the Debtor's pension plans that were transferred to ConRail (an issue explicitly left open in this Court's earlier opinion *In re Central Railroad Company of New Jersey, supra,* (5) the constitutionality of the super-priority and interest provisions afforded § 211(h) obligations by the Act, (6) the propriety of paying administration claims in forms other than cash, (7) the existence of priority status for six-month creditor claims, (8) the relative priorities among the collateral trust notes, the general mortgage bonds, and the obligations to six-month creditors, (9) the propriety of recognizing a continuing interest in unsecured creditors and stockholders of the Debtor, (10) the competing claims of the State and the estate arising out of former passenger subsidy contracts and the contract for the rehabilitation of the mainline, (11) the estate's claim against the State for subsidies of the light density lines, (12) the Trustee's dispute with ConRail concerning the § 211(h) program, (13) the Trustee's dispute with the State of New Jersey concerning the estate's right to setoff against trustee certificates, and (14) the right of high priority claims to early payment in cash.

14. The Amended Plan therefore involves a complex series of interrelated compromises and proposed dispositions presented as a single package. Indeed, the State of New Jersey only supports the plan based upon the condition that the entire package be accepted and at an early date. The Amended Plan must be considered in light of these exigencies; the massive, expensive and protracted series of litigations that would ensue if the plan were rejected; and the position the parties would be in in such circumstances.

15. If the Amended Plan is rejected, there would be pursuant to this Court's earlier opinion, *In re The Central Railroad Company, supra,* hearings to determine the amount of cash resources that the estate should retain for its continued administration (including for the prosecution of the valuation case) and a direction to the Trus-

tee to liquidate the remaining assets and to distribute available proceeds to the claimants in accordance with their priorities. Such a process, no doubt, would require the inevitably protracted and expensive litigation of all or most of the disputes in Finding No. 13. During the course of that litigation, interest accruals would continue to mount and few, if any, creditors would be paid. The results of such litigation to the estate as a whole or to the relative positions of the various claimants to the estate are uncertain. What does appear clear, however, is that those parties with both the most to gain and the most to lose from such a process have concluded that the arrangements embodied in the Amended Plan present the preferable course to pursue; and those arrangements, with their anticipated reductions in the overall indebtedness of the estate, are protective of and benefit the interests of unsecured creditors and present stockholders.

16. Implementation of the Amended Plan will recognize the accommodations reached by the principal parties in interest and put an end to this proceeding which is now in its thirteenth year. The Trustee projects that the Reorganized Company will be able to operate at a modest profit of from $.3 million to $.5 million per year, depending on the extent to which administration claimants elect between Option A and Option B, and assuming no further improvements in operating results from the sale of existing properties or the entry into new ventures. The Trustee indicates that on a fully accrued accounting basis the Reorganized Company may report losses due to the required accounting treatment of the Series A Notes. Neither interest nor principal will be paid on those notes until the proceeds are realized from the valuation case; but, for book purposes, the notes will accrue interest annually—approximately $900,000 in the first year of operations. Under accrual accounting principles, the Reorganized Company will recognize the interest expense even though it is not paid currently; but the company is not permitted to recognize the offsetting interest income which is presently accruing and will continue to accrue with respect to the valuation proceeds on an annual basis at the rate of 8% per year, compounded annually. 45 U.S.C. § 746. This accounting recognition of interest expense without a compensating accounting recognition of interest income will distort the reported operating results of the Reorganized Company prior to payment of the valuation proceeds. This distortion should not be given effect here. There is a reasonable likelihood that sufficient proceeds, with accrued interest thereon, will be available from the valuation case to offset the interest accrued on the Series A Notes when they become due; and the Trustee's projections show that the Reorganized Company can service its remaining debt and still generate a modest profit at present levels of operation.

D. *The Positions of the Parties*

17. As previously noted, the Amended Plan is supported by the United States, the State of New Jersey, and representatives of the bondholders. (The Bondholders' Protective Committee supports the Amended Plan and the Indenture Trustee has taken no position). Together they represent the bulk of the debt and the highest priority debt; and they have made the principal concessions that have adjusted interests between themselves and improved the position of lower priority claimants. The United States has agreed to defer payment of the § 211(h) debt and to reduce the amount by about $2 million through the settlement of pension and vacation issues. It has agreed to finance the removal of the Newark Bay Bridge and to subordinate its potential $14 million claim for reimbursement under the Bridge Act, 33 U.S.C. § 491, *et seq.*, to a position substantially lower than it might otherwise have. The State has agreed to provisions offering it and others similarly situated the option to accept either 40% cash and 15% contingent non-recourse note payout on administration claims (potentially saving the estate approximately $13.6 million) or a series of notes involving deferral of payments and, in part, substantial subordination in priority position. The bondhold-

ers have agreed to a *pari passu* treatment with the United States' collateral trust notes. All three have agreed to the proposed releases of claims between the State and the estate (and collectively they have the most to gain or lose in such claims); and all three initially agreed to recognize a relatively high priority status for six-month claims and continuing interests of the unsecured creditors and the Debtor's stockholders.

18. In view of certain objections filed by the Debtor's present shareholders, the bondholders asked the Court to determine that the stockholders had no standing to object on the grounds that CNJ was insolvent and that the equity of its shareholders had no value. The Trustee, purporting to exercise authority granted to him pursuant to § 77(e) of the Bankruptcy Act and N.J.S.A. 14:14–24, *et seq.*, elected to accept the plan on behalf of the Debtor and its shareholders. For reasons indicated below, the Court will give no effect to these steps.

## CONCLUSIONS OF LAW

1. A few objections have been filed by certain parties. With one exception, these objections were occasioned by ambiguities in the language of the Amended Plan and have now been resolved and withdrawn. The only remaining objections are those of the present stockholders; and the Court finds such objections to be without merit.

2. The stockholders object to the fact that under the Amended Plan they do not receive any equity in the Reorganized Company. However, to receive such equity, they must show some present value in their stock, "for unless the reasonable value of the debtor's property has not been exhausted by proper provision for senior [claimants]" there is no reason to issue securities to the debtor's present shareholders. *Wisconsin Cent. Ry. v. Zelle*, 210 F.2d 113, 116 (8th Cir. 1954); *Ecker v. Western Pacific R. Corp.*, 318 U.S. 448, 476, 63 S.Ct. 692, 87 L.Ed. 892 (1942). There are more than $163 million in claims ahead of the stockholders; and the assets presently available to the estate, no matter how generously valued,

are clearly insufficient to satisfy these claims. The Debtor's balance sheet (which assumes a valuation case recovery equal to the approximate $63 million in book value of the assets transferred as well as realization of the book value of CNJ's investment in its subsidiaries) shows a deficit in the net worth account of approximately $36 million; and no reasonable capitalization of the prospective earnings of the reorganized company, the traditional § 77 valuation method, *Ecker v. Western Pacific R. Corp., Id.*, would suggest any equity for the present stockholders after making provision for the prior indebtedness. Since only a valuation case recovery in the upper range of that sought can produce any recovery for present shareholders, the contingent interest certificates are the proper means for meeting present stockholder claims. *See, In re Boston & Providence R. R.*, 260 F.Supp. 415 (D.Mass.1966) for use of a similar device in parallel circumstances. For these reasons, the Court will not accept the present efforts of the bondholders and the Trustee to cut out the stockholders.

3. The stockholders also suggest that the plan is premature. The Debtor has been in reorganization for more than 12 years; and no compelling reason is offered to require it to continue to mark time while further substantial accruals against the estate are incurred and opportunities for the present reorganization of the Debtor are lost. Other railroads subject to the RRRA have been reorganized and are in the process of reorganization in the presence of such unknowns; and this Court will not jeopardize the possibility of ever reorganizing the Debtor when the stockholder interests are already protected under the Amended Plan. Shareholders are no more deserving of "procrustean measures" than other claimants in these proceedings. *Penn Central Merger Cases*, 389 U.S. 486, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968).

4. The stockholders object that all presently available net operating losses are not to be preserved to shelter the valuation recovery. However, § 374(e) of the Internal Revenue Code preserves the expired $35

million in tax loss carryforwards, to the extent they are otherwise available, to offset gain on the valuation recovery. Since the Trustee does not even seek a valuation recovery of more than $35 million over the book value of the transferred assets, the concern raised by the stockholders is too speculative to require accommodation.

5. The stockholders object to the settlement of the Newark Bay Bridge controversy. But they did not object to the settlement when it was recently before the Court for approval on a separate petition. The settlement has already been approved and is not subject to challenge in the plan hearings. In any event, it is not necessary that every disputed claim be litigated. *Freeman v. Mulcahy*, 250 F.2d 463, 475 (1st Cir. 1958); *In re Penn Central Transportation Co.*, 458 F.Supp. 1234 (E.D.Pa.1978); *In re Boston & Providence, supra*, at 421. Here, compromise is clearly in everyone's interest since a decision adverse to CNJ would result in a potential cash drain that could jeopardize all reorganization prospects.

6. The stockholders further object that secured creditors may receive more than 100% of their claim—a contention based on double counting of the real estate subject to the Port Authority leases, an expectation that the upper limit of the valuation of the retained assets will be realized, a wholly conjectural valuation of $12.5 million on tax losses available to the Reorganized Company, a wholly conjectural estimate of an additional $13 million recovery in the State condemnation cases and a wholly conjectural estimate of a valuation recovery that would pay the bondholders in full. These conjectures, if cognizable, ignore the reality of the modest earnings projected for the Reorganized Company which leads to greater concern that the shareholders of that company will have received too little rather than too much for their claims.[1]

7. Finally, as to the objections, the largest shareholder, Reading Company, objects to control of the valuation case by the Reorganized Company, suggesting it might seek to settle cheaply once its own interests have been satisfied. The Trustee has pointed out the Reading's active opposition in the Special Court proceedings to central contentions of the CNJ. Under the Amended Plan, this Court shall retain jurisdiction over any proposal to settle the valuation case; and all parties will have adequate opportunity to be heard on any settlement. At such time Reading can voice such objections as it has and they can be addressed in light of any negative impact the Reading's opposition in the Special Court may actually have on the CNJ's claim.

8. Section 77, to the extent here relevant, requires that before the Court approve a plan that the Court find that the plan is feasible (*i. e.,* provides adequate coverage of fixed charges and adequate means for its execution), is fair and equitable and does not discriminate unfairly in favor of any class of creditors or stockholders, fully discloses all fees and expenses to be paid incident to the reorganization, and provides for the payment of all costs of administration and other allowances made by the Court.

Based upon the evidence presented, the Court finds that:

(a) the plan is feasible in that adequate resources are available to make the cash payments required by the plan, including such allowances as the Court may hereafter

---

1. It should be noted that the stockholders' analysis ignores the fact that the existing interest accruals on the secured debt have been calculated on the lower rates in effect prior to their default rather than the higher rates provided for in the governing instruments once default occurs. To the extent the Debtor is solvent, such interest is validly owing. *Ruskin v. Griffiths*, 269 F.2d 827, 830 (2d Cir. 1959), cert. den. 361 U.S. 947, 80 S.Ct. 402, 4 L.Ed.2d 381 (1960); *In re Imperial 400*, 374 F.Supp. 949 (D.N.J.1974). The enforceable interest claims of secured creditors therefore might greatly exceed the interest recognized in the Amended Plan. Since such interest claims must be paid in full before shareholders participate; and since the Amended Plan proposes to pay such claims with notes rather than cash; it is appropriate that such notes themselves shall bear interest. It follows that the stockholders' contentions concerning the payment of interest on interest is without merit. *Cf. In re Wisconsin Central Ry. Co.*, 112 F.Supp. 916, 922 (D.Wis. 1953); *aff'd*, 210 F.2d 113 (8th Cir. 1954).

make and to meet the fixed charges of the Reorganized Company as payment thereof becomes due;

(b) the plan does not discriminate unfairly in favor of any class of creditors or stockholders and is fair and equitable in that due recognition has been given to the priority of the various classes of claims in light of the compromises agreed to by certain of such claimants and the legal questions regarding various priority issues;

(c) all fees and expenses to be paid incident to the reorganization are subject to the approval of the Court and fully disclosed in applications now pending;

(d) provision has been made for the payment of all costs of administration and other allowances; and

(e) the plan complies with all other requirements of law.

9. The preceding conclusions have not been accompanied by extensive discussion of the possible outcome of the numerous legal questions that exist with regard to many aspects of the claims of various creditors and which the plan has sought to moot through the compromises agreed upon by the principal claimants. Many of these issues were considered at length in the recent opinion of Judge Fullam approving the Penn Central Reorganization Plan; *In re Penn Central Transportation Co., supra*; and little point would be served in covering such ground anew, particularly in the circumstances present here where the parties with the principal stake in the outcome of such disputes have agreed to the plan's provisions. Such parties, who in a liquidation could have taken all of the present assets of the estate, have not sought or been granted more than the fair equivalent of their rights under the plan; and, in fact, by permitting junior claimants with no presently ascertainable interest to participate, have insisted on less than they might. The Amended Plan accords reasonable priority positions to the tax and six-month claims in light of the questions concerning the proper priorities of such claims and properly vests control of the Reorganized Company with those having actual ownership of its assets

under any appropriate analysis; *see Ecker v. Western Pacific R. Corp., supra.*

The Amended Plan as filed on May 31, 1979, including the classifications of creditors contained therein, is approved.